Railway Company vs. LeRosen.

## No. 13,241.

### VICKSBURG, SHREVEPORT AND PACIFIC RAILWAY COMPANY VS. MISS SUSIE LEROSEN.

#### SYLLABUS.

A claimant of land by adverse possession can not tack to the time of his possession that of a previous holder where the land is not included in the boundaries in the deed from such holder.

I N RE Vicksburg, Shreveport and Pacific Railway Company applying for *certiorari* or writ of review to the Court of Appeals, First Circuit, Parish of Caddo, State of Louisiana.

*Wise & Herndon* for Plaintiff.

Respondent judges *pro se.*

*Holbert & Barret* for Defendant.

The opinion of the court was delivered by

NICHOLLS, C. J. The judgment of the Court of Appeals, rendered on appeal to it from the District Court of Caddo, which has been brought before us for review upon this application, was as follows:

"The facts at issue in this case are accurately stated by the district judge as follows:

"This is a suit to establish the boundary line between the right of way of the plaintiff and two lots, or parcels of ground, in ten acre Lot 31, owned by the defendant.

*The right of way* of plaintiff company is seventy-five feet in width from the *centre line of its track,* and the plat filed by Frank W. Crane, city engineer, *shows an encroachment of 37.84 feet by defendant's enclosures on* said *right of way.*

The only real defense is the prescription of *thirty years.* In *1858,* the author of plaintiff company purchased from John M. Landrum, the *right of way* in question.

In July, 1859, Noah G. Tryon purchased from the same vendor, "a portion of ten acre lot No. 31, fronting eighty feet on the alley, according to a plat filed March 21st, 1857, and running back to

*within seventy-five feet* of the centre of the Vicksburg, Shreveport & Texas Railroad Company, grade as now established, and fronting eighty feet on the land on which the said railroad has the right of way," etc.

In 1880, Mrs. M. J. Tryon, widow, purchased lots *fifteen and sixteen* of the Wise subdivision, lot fifteen adjoining the parcel of ground purchased by Noah G. Tryon from Landrum.

In *1887*, W. A. LeRosen purchased from Mrs. Tryon the same parcel of ground purchased by Noah G. Tryon, from Landrum in *1859*, "fronting eighty feet on the alley, and running back to the right of way of the Vicksburg, Shreveport and Pacific Railroad," as *per map recorded in V. 838.*

The vendor reserves the right to remove all improvements from said lots.

In *1888,* Mrs. Tryon sold lot *fifteen* to W. A. LeRosen, reserving the right to remove all the buildings thereon. Defendant claims title, through reserve conveyances, from W. A. LeRosen.

In the deed from *Mrs.* M. R. LeRosen, to defendant, the property is described in the same manner as in the deed from Mrs. Tryon to W. A. LeRosen, *i. e.,* as "running back to the right of way of the Vicksburg, Shreveport and Pacific Railroad."

The articles of the Code bearing on the question provide: Whether the titles exhibited by the parties, whose lands are to be limited, consist of primitive concessions or other acts by which property may be transferred, if it be proved that the person whose title is of the latest date, or those under whom he holds, have enjoyed in good or bad faith uninterrupted possession during thirty years of any quantity of land beyond that mentioned in his title, he will be permitted to retain it, and his neighbor, though he may have a more ancient title, will only have a right to the excess, for if one can not prescribe against his own title, he can prescribe beyond his title for more than it calls for, provided it be by thirty years possession. C. C., 859.

When a person has once acquired possession of a thing by the corporeal detention of it, the intention he has of possessing suffices to preserve the possession, in him, although he may have ceased to have the thing in actual custody either himself or by others. C. C., 3442.

"To be able to acquire possession of property, two distinct things are requisite."

1. The intention of possessing as owner.

2. Corporeal possession of the thing. C. C., 3456.

"As to the fact itself of possession, a person is presumed to have possessed as master and owner, unless it appears that the possession began in the name of and for another." C. C., 3488.

"The actual possessor, when he proves that he has formerly been in possession, shall be presumed, also, to have been in possession in the intermediate time." C. C., 3492.

"The possessor is allowed to make the sum of possession necessary to prescribe, by adding to his own possession that of his author, in whatever manner he may have succeeded him." C. C., 3493.

Applying these precepts of the Code to the facts of this case, it remains to determine and fix the rights of the parties.

In order to push the original boundary of the defendants' property, by enclosures on to the property of the plaintiff, it is incumbent on the defendant to fix the fact of possession by strong and cogent testimony for the length of time required by law.

In order to enable one to prescribe beyond the limits of his own title, he must have possessed as owner for the longest prescriptible period known to the law—thirty years.

In the original purchase by Noah G. Tryon, from Landrum, the extent of the right of way of the plaintiff company is fixed at seventy-five feet from the centre of the grade as then established.

In 1887, Mrs. Tryon sold to W. A. LeRosen the same property, and defined the boundary as the right of way of the railroad. The theory on which the district judge seems to have decided the case is that this was recognition of the boundary as fixed in the original purchase of Tryon from Landrum, and, therefore, that this was an *acknowledgment* that the right of way extended into the enclosure of the defendant, and defeated the plea of prescription. He cites, in support of his position, the case of City vs. Shakspeare, 39 Ann. 1033, and says:

"In this case at bar, the deed of Mrs. Tryon specifically describes the southwest line of the right of way belonging to plaintiff, as the boundary of the lot conveyed. Under such a deed, how could it be contended that Mrs. Tryon conveyed a part of the right of way to LeRosen?"

We can not follow our learned brother in his process of logic.

There is no contention, as we understand and appreciate the issue, that the deed of Mrs. Tryon to LeRosen, in terms, conveyed the property. If this was the case, the defendant would only have need of the prescription of ten years, and would be dispensed with further proof, and the plaintiff relegated to another form of action.

The contention of the defendant is that the right of way of the plaintiff company has not been marked by any visible signs or monuments, and that Mrs. Tryon possessed up to the old fence, and delivered same to him, and that both have possessed for more than thirty years. The deeds of the parties are only aids in determining the extent of the possession, and are only consulted in actions of boundary for such purposes.

The case, in our opinion, does not hinge on any stipulations in the title deeds of the parties, but is to be determined alone on the plea of thirty years' prescription, tendered by the defendant.

While Tryon's deed stipulates that the lot extends back to within seventy-five feet of the centre of the grade, he appears to have taken possession of some thirty-seven feet of the right of way of the plaintiff by enclosing the same with a fence.

Mr. Guynemer testified that he lived on the property in 1874 and 1875, and that there was a fence on the back within thirty-five or forty feet of the centre of the track; that he "played there as a boy quite often all around that back fence," and "climbed a little oak tree that used to set there in one corner."

That the fences then were in a decayed condition.

Mr. David LeRosen testified that he, or his family, have owned the property for thirteen years, and that when they bought it there was an old fence back there on the line indicated by the surveyor; that there was an old orchard back there, and also a large cottonwood tree, supposed to have been planted by Mrs. Tryon; that the old fence on the back was pointed out as the boundary line between the railroad and the property.

Taylor Segur testifies that he has known the property since 1865, and that the fence is now where it was then.

Mr. James Heffner testifies that he has been living here since 1864 or 1865, and that he is familiar with this property, and lived there in 1867 or 1868; that the fence to-day is about where it was then; that the property has been enclosed continuously since; that some changes may have been made in the location of the fence; that, in 1867, it was

an old fence; that he passed along the railroad frequently and never noticed the absence of a fence at the place where it now stands, but has seen it since he left there.

Emile Wortman testifies that he remembers back to 1865, and that the fence occupies about the place now that it did in 1865, and that the line has never been materially changed; that he is a tinner by trade, and frequently goes on the track of the railroad, which is used frequently by pedestrians, and has never known a time since 1867 that there was not a fence back of the Tryon lot, where it is now located.

Mr. Barret testified that he has known the property since he was a child, say 1867, and that he does not remember the time when there was not a fence about where the fence is now; that he is unable to say that there has not been a time, since 1867, that there was no fence, but if there was a time when there was no fence, he can not recall it.

The countervailing evidence on the question of the location of the original fence, and its being repaired and moved westward, is that of Messrs. Wise and Herndon, both of whom testify that along in 1874 there was a considerable ditch running across the eastern portion of Mrs. Tryon's property; that, in consequence of this ditch, Mrs. Tryon had taken the fencing that had originally been near to cut off the railroad, and moved it back some distance, and after the ditch filled up the fence was moved back.

On cross-examination Mr. Wise states that, four or five years afterward, she moved the fence back, and that the orchard extended nearly back to the old fence line.

Mr. Herndon says that, in 1874, there was an old fence back there some thirty or forty feet from the railroad; that it was an old and very much decayed fence, and that the fence is now practically located where the old fence was.

Mr. Guynemer, when recalled for the plaintiff, testified that the fence was on the same location in 1879 when he moved back there.

So, to our minds, the case hinges entirely on a question of fact—the possession of thirty years in the defendant and his authors. But for the short time that the fence appears to have been moved back, on account of the ditch, the case would be clearly with the defendant as to the boundary of the original Tryon track.

The deed of defendant, referring to the right of way of the plaintiff, as the eastern *boundary, subordinates* its extent in determining the

quantity of land conveyed, and not including by its terms any portion of the right of way, the prescription of ten years does not apply, and possession of thirty years has not been shown to any portion of the right of way east of lot fifteen, and that branch of the case is with defendant.

As to the other. In the case of Provost Heirs vs. Johnson, 9 M., 123, the Supreme Court held that when a person claims by possession alone, without showing any title, he must show an adverse possession by enclosure, and his claim will not extend beyond such enclosure.

In the case of Bernard vs. Show, 1 Martin, N. S., 480, the facts proved established the plaintiff's right of possession to the whole body of land sued for; the defendant, however, gave in evidence his possession and cultivation of a field of fifteen arpents, but neither the pleading, nor the evidence, ascertained the *particular spot* where his possession was exercised, and the defendant's pretentions are disregarded.

In the case of McDonough vs. Childress, 15 La., 566, the court held that it was necessary, in an action of possession, not only to show acts of limited and restricted possession, but also to establish, by legal evidence, the extent and full limit of the property possessed. 19 L., 251.

In Wilson vs. Martin, 10 Ann., 327, it was said: "Possession *animo domini* forms the basis of this species of prescription; it must be, at least in its commencement, a corporeal possession, and must be continuous, uninterrupted, peaceable, public and unequivocal."

Again: "Such a possession, without any title whatever for thirty years, will enable the possessor, who invokes the plea of prescription, to hold dominion over the land against the world. With a title translative of property, and aided by good faith, a possession of a like character for a period of ten years will suffice."

Possession in all cases is a mixed question of fact and law. It is determined, very largely, by the nature and character of the property, and the use for which it is destined. Chamberlain vs. Abadie, 48 Ann., 569.

It is eveident, from the different provisions of our Code, that our laws on this subject recognize two species of possession, natural possession and civil; natural possession, which may be called possession in fact, is when a man detains a thing corporeally, as by occupying a house or cultivating a field; and *civil* possession, or possession in

right is, when a person ceases to reside in a house, or cultivate the field, which he once occupied, but without abandoning his possession. C. C., 3427, 3428, 3429.

Possession is acquired by the *actual* and *corporeal* detention of the property; this is the *natural possession,* or possession in fact; and it is preserved and maintained by the mere *will* and *intention* to possess; and this is the *civil* possession or possession *in right*. Ellis vs. Provost, 19 L., 251.

Now, in order to acquire prescription by the possession of thirty years, without title, it is necessary that the possessor should have held the thing *in fact* and *in right* as owner.

In order, however, to complete a possession already begun, *the civil* possession shall suffice, provided it has been preceded by *actual possession*. C. C., 3487.

So it is with regard to the *right of possession*. "When a person has once acquired possession of a thing by the corporeal detention of it, the intention which he has of possessing *suffices to preserve the possession in him, although he may have ceased to have the thing in actual custody, either himself or by others."* C. C., 3442, 3433, 3444.

How is this possession lost?

"Possession is lost with the consent of the possessor."

"1.   When he transfers this possession to another with the intention to divest himself of it.

"2.   When he *does some act* which *manifests* his intention of abandoning possession, as when a man throws into the street furniture or clothes, of which he no longer chooses to make use." C. C., 3448.

Again: "A possessor of an estate loses the possession against his consent:

"1.   When another expels him from it; whether by force or driving him away, or by usurping possession during his absence and preventing him from re-entering.

"2.   When the possessor of an estate allows it to be usurped and held for a year without, during that time, having done any act of possession, or interfered with the usurper's possession."

All of the articles of the Code on the subject matter must be construed together; and applying the principles announced in them we are of the clear conviction that the case is with the defendant on plea of prescription of thirty years.

The evidence is overwhelming that the Tryon lot was enclosed back to the railroad cut, or the line now indicated as the location of the fence, along about 1864, and trees planted, and even though the fence may have fallen, and the trees decayed, yet all were potent witnesses of the fact of actual possession. Whilst the fence may have been moved from the *locus in quo* for a few years, yet the fact remains that the railway company did not take possession of the territory in the meantime, and the moving of the fence back, on account of the encroachment of the ditch, was not the *doing of any act*, on the part of the claimant, which *manifested* an intention of abandoning the property.

Mrs. Tryon appears to have watched the efforts of her more progressive neighbor, Mr. Wise, to fill the ditch or stop the wash on his property, the effect of which was to fill the wash on her own property, and then it was that the fence was set back to its ancient limits.

Surely this was not such an abandonment as would have the legal effect of interrupting the course of prescription within the contemplation and meaning of the Code.

The remains of the old fruit trees were sentinels, warning the officials of the road of the possession of an adverse claimant.

For more than a quarter of a century the railroad officials have done no acts manifesting dominion over this property, and the boundary marked by the original fence has been looked to for more than thirty years as the limits of the property.

A boundary so *marked and recognized* for thirty years, and more, will not be disturbed at this late day.

Has there been such a recognition of the right of way of the company as would stop the current of prescription? We think not.

The recognition contended for by plaintiff, and sanctioned by the judge, is only contained in the recitals of the deeds to the defendant.

As we said, in the McCloud case, the road has never planted any posts or otherwise monumented the extent of its possession. The extent of its limits have been invisible and undefined. The only tangible sign of the extent of its possession has been the excavation in the earth along where it passes. There is no law that fixes the width of the right of way of a railway company, and when we sell by reference to the right of way, unless there be some signs to mark the limits, the reference could hardly have any legal significance except the part actually occupied by the road-bed, dump, or cut.

If the right of way was a recognition of the ownership of the company in the *locus in quo*, where did it begin, and where did it end? A person could hardly recognize the ownership of another in specific property, when there was nothing to show the *identity* of the property.

Therefore it seems clear that a reference to the right of way in the recitals of the deed, as the eastern boundary of the property conveyed, could not be such a recognition of the limits called for by the plaintiff's title proper, as the true boundary, or would serve to stop prescription. If, at the time, the right of way had been marked out, then the defendant would have been concluded.

The truth of the matter is, that no one knew exactly how far the right of way did extend. The space of ground was never needed until recent years, when the officials began to investigate the extent of its possessions.

In this case the proof seems to be clear that all the parties looked to the old line of fence as the true boundary, and the extent of the right of way, of the railroad company.

Any reference to a monument as a boundary, to be binding and conclusive, the same would have to be well marked so as to be of easy identification. The legal advisers of the company knew the character of recognition that would silence the plea of prescription. They offered to lease the *locus in quo* to the defendant. This would have been the kind of recognition that would have set at naught all the contentions of the defendant.

Our conclusion is, as to the Tryon lot, that the case is with the defendant, and the judgment appealed from will be readjusted accordingly.

It is therefore ordered, adjudged and decreed, that the judgment appealed from be amended; and it is now ordered, adjudged and decreed that the line marked "fence" on the plat made by F. W. Cane, on the back of the lot marked "Mrs. Tryon" be, and is hereby decreed to be the true boundary line between the right of way of the plaintiff and said lot owned by the defendant; and, as thus amended, and in all other respects, the judgment appealed from is affirmed, the appellee to pay costs of appeal."

### OPINION.

We do not think that it can be denied that the boundary line, as fixed by the survey made under order of court, and adopted by it, and

made the basis of its judgment, is the true boundary line between the properties of the plaintiff and the defendant according to their written titles, nor do we think there is any claim set up that those titles conflict in any manner with each other.

Defendant's contention is that she and her authors have had, for a long time, possession of the strip of land in controversy herein, and, by reason of that fact have acquired the ownership of the same by the prescription of thirty years.

The defendant, Miss Susie LeRosen, holds her title from an act of sale of date of the 2nd of April, 1896, by purchase from Mrs. Mattie LeRosen, wife of David LeRosen.

The property purchased was described as lots one, two and three, of block one, of ten-acre lot, thirty-one, of the city of Shreveport.

Also:

A portion of said ten-acre lot *thirty-one lying* immediately in rear of lots one and two of said ten-acre lot, said land fronting *eighty feet on the alley, and running back to the right of way of the Vicksburg, Shreveport and Pacific Railroad, as per map recorded in conveyance book, page 338.*

Also:

Lot fifteen (15) of said ten-acre lot thirty-one (31), as per said map, together with all the buildings and improvements on all of said property.

The portion of the property with which we are concerned at the present time is that secondly described, the description of which we have placed in italics.

The title by which Mrs. Mattie R. LeRosen held is not in the record, but it is conceded that her title was derived from one John M. Landrum to N. G. Tryon, and from him by conveyance to different parties down until it reached Mrs. LeRosen; the description of this particular property in all of these conveyances being substantially identical.

The act from Landrum to Tryon was of date of the 3rd of July, 1859.

The railroad right of way referred to in the different acts of sale was acquired by purchase from Landrum also, but prior to the sale by him to Tryon.

The defendant claims that the back line of her tract should be extended thirty-seven feet further toward the railroad track than

where it is placed by the survey filed, and this claim is predicated upon the contention that Tryon and his wife (the latter it would seem having acquired the ownership of the property at one time, though when and how does not appear) and the various owners of the property prior to the purchase made by the defendant, Miss Susie LeRosen, had taken corporeal possession of these thirty-seven feet and held possession of it continuously and successively until it was conveyed to her in 1896.

That she herself had had corporeal possession since 1896, and that, under Article 3493 of the Civil Code, she is entitled to add to her possession that of all the parties who had had possession of these thirty-seven feet commencing with N. G. Tryon, and running down to herself.

That this addition or connection of different possessions would show a possession adverse to the plaintiff of over thirty years, which would enure to her benefit and vest the title in her by the prescription of thirty years.

Articles 3493, 3494 declare that "the possessor" is allowed to make the sum of possession necessary to prescribe by adding to his own possession that of his author, in whatever manner he may have succeeded him, whether by an universal or particular, a lucrative, or an onerous title.

"By the word 'author,' in the preceding article, is understood the person from whom another derives his right, whether by a universal title, or by succession, or by particular title, as by sale, by donation, or any other title onerous or gratuitous."

If a person, holding a written title calling for a tract of ten arpents fronting on a certain stream by a depth of forty arpents between parallel lines, should have taken actual corporeal possession of property to the depth of fifty arpents, and hold it for five years, and then sell it to another person, describing it as a tract of ten arpents, fronting on the stream *by a depth of fifty arpents between parallel lines, and the vendee should take actual adverse possession to the depth of fifty arpents*, it may be that if a contest should arise between the actual owner and the second possessor, and the rights of parties were to be settled by the rules of prescription, the possession of the author, beyond his title during the five years, might enter as an element or factor to some extent in determining the question of prescription as to the vendee, but if the vendor, though holding fifty arpents in his

possession, had, when selling to his vendee, described the property sold as a tract of *ten arpents front on the stream, by a depth of forty arpents between parallel lines,* the vendee, under such a specific written title, could not pretend, in any future contest with the actual owner, that he could for the purpose of pleading prescription for the acquisition of this additional depth of ten arpents to the tract, add the possession of his vendor of that particular property to his own possession.

He could not do so for the very obvious reason that the vendor did not undertake to sell him the tract to this additional depth, and could, in no sense, be held to be his author.

He would only be his author to the extent of the title conveyed.

If we were to assume that after the vendee should have held, for several years, actual possession of this property beyond the title conveyed to him, the actual owner should have instituted proceedings to restrain and keep him within his legal rights, could the possessor, as a legal right, call the vendor in warranty to defend either his title or his possession?

We think not.

Neither ownership, nor possession, would have been transferred to the vendee under his act of purchase beyond its terms.

If there was any continued adverse possession of the property after the sale, it would be the adverse possession of the vendor up to the time that his adverse possession was ousted by that of a third person, or abandoned.

There is a very great difference between prescribing inside of a title for more than the vendor owns, and prescribing outside of the title for more than the vendor owns, or has conveyed.

In the first case the prescription applicable would be that of ten years, the purchaser adding possibly to his own possession for the purpose, to some extent, of prescription, the antecedent possession of his vendor (although the character of the two prescriptions would be different, one being the prescription of ten and the other of thirty years), while the prescription applicable to the second case would be that of thirty years, which prescription, resting upon his own separate and independent adverse possession (a possession not in privity with that of his vendor), would take date only from the commencement of that adverse possession. Mays vs. Witowsky, 46 Ann., 1480.

The same principle is recognized in other States of the country, and is announced in the American Digest as follows:

"A claimant of land, by adverse possession, can not tack to the time of his possession that of a previous holder, where the land is not included in the boundaries in the deed from such holder. Smith vs. Rich (Sup.), 30 N. Y. S., 167; 80 Hun., 287; Am. Dig., 1895, pp. 58-116. See also Adkins vs. Tomlinson, 121 Mo., 487; Albars vs. Fitzgerald, 87 Wis., 516; Carson vs. Dundas, 39 Neb., 503; Lows vs. Shaffer, 24 Or., 239; Am. Dig., ss. 127, 130."

Whatever may have been Mrs. Tryon's rights under her possession of any part of plaintiff's right of way, she transferred none of such rights to LeRosen, nor did Mrs. Mattie LeRosen transfer to Miss Susie LeRosen any rights of possession which she may have had, and the latter can not avail herself of the time of possession of any of the antecedent parties holding title under the same distinct and specific written title, which was conveyed to her of any strip of land beyond the calls of the deed.

The adverse possessions which may have been held by these different antecedent owners were separate and distinct from, and not in privity, with each other, and so far from being cumulative or connected, the actual possession of the predecessor was ousted by the subsequent adverse possession of his vendee.

A good deal of discussion has been made as to the facts and circumstances which go to constitute an adverse possession, and those which go to constitute an abandonment of such possession after having once commenced, but under the view which we have taken of the principles of law in this particular case, we deem a decision of the questions unnecessary.

The evidence so far from disclosing a continuity of adverse possession, shows distinct breaks at each change of ownership through the different purchases of the same specifically described and defined property.

We are of the opinion that the opinion of the District Court, appealed from, was correct, and that the Court of Appeals erred in modifying it.

For the reasons assigned, it is ordered, adjudged and decreed, that the judgment of the Court of Appeals, in so far as it amended or modified the judgment of the District Court, appealed from, is

hereby annulled, avoided and reversed; and it is ordered, adjudged, and decreed, that the said judgment of the District Court, appealed from, be, and the same is hereby affirmed.